Choose this Department of Correction at all Good morning. May it please the court, my name is Joel Thompson. I represent the plaintiffs here on appeal and I'd like to reserve two minutes of my time for rebuttal. We're here appealing from a grant of summary judgment to the defendants in the case involving five prisoners challenging a policy change within the Department of Corrections made by the DOC and its medical contractor and it was an extraordinary change for several reasons. First, it singled out a class of prisoners, HIV patients. Second, these patients had had medications on their person or at least available, they were eligible for the Keep On Person program for over 10 years before this change was made. And third, it was based on an allegation at the time that these patients could no longer be trusted to take their medications, that they needed to be monitored and in a very paternalistic way, they needed to be babied and to take in their meds. The record reflects that that is just not the case, that is not what was happening on the ground. Let me ask you about that because I understand the evidence. After they made the switch in the initial time frame, there was something like a 13 percent increase in patients showing no detectable viral load, although that wasn't a long enough period, based on your expert testimony, to be statistically significant. But over the long run, by the time they tested, there was an improvement that your expert has not said is not statistically significant. So it sounds like the health of the HIV population, at least according to one major indicia of health, improved noticeably as a result of the change. How do you deal with that? In a couple of different ways, Your Honor. First, to put things in context, the starting point was a point of 80-something percent undetectable viral loads before the policy change. What our expert says is, if you want to see what the effect of this policy change is, you better look to the period immediately before and immediately after the change because that is about the closest you are going to get to controlling for other factors. And that change, although there is a slight uptick, he says when you run it through statistical models, it's not statistically significant change in viral loads. What the defendants rely on is that three years later, in 2012, there is a more significant change to whether 90-something percent of patients do have undetectable viral loads. And what we submit is, and the expert agrees, is you can't trace that to taking away keep-on-person medications because there's too many other things that happen. Most notably, prisoners come and go. So the change is not significant at that time. Secondly, new medications came online, or new formulations of medications in 2008-2009 that have changed viral loads everywhere. And it's no surprise at all that it changed things for the better in the prison setting also. It's not, but again, going back to the context and to the time of the change, there wasn't a problem that needed solving with viral loads. And particularly because under the keep-on-person program, individual patients who are struggling, whether because there's, you know, objective evidence that they are not taking their medications, or because their viral loads, their CD4 counts, their medical testing is showing a problem, one way or the other, they could be taken out of the program. When you say there wasn't a problem, if I hear that in one scenario there's an 83 percent who are meeting the key criteria, and in another scenario it's 95 percent, I would think someone would be suing the prison if they weren't achieving the 95 when they could as opposed to the 83. And I understand you say, well, maybe other things explain the improvement, but there's, whose burden is it to show that the confounding factors may or may not have explained the improvement? Well, regardless of the burden, we can meet it if it's ours with the, you know, with our expert testimony and with the provider testimony. But let me ask you about that. You haven't met it. There's no statistical analysis. As I read your expert, he's simply saying other things could explain this. And you've mentioned two of the things. Right. And as a result, well, because we're not dealing with a randomized controlled trial, you know, it would be impossible to, you know, go back in time and, you know, if you really wanted to know the answer to the question about the keep-on-person program in that sense to that, you know, to that degree of definiteness, you would have to split the patients up in half, take keep-on-person away from half. But I don't think, how can the legal standard be one that unless present officials do scientifically controlled studies that would get peer-reviewed and published, they can't sit back and make the common-sense decision that 83 percent healthy, 95 percent more healthy are healthy. Why wouldn't we be insisting that they do the latter, not, in fact, claiming that they breached the law by doing the latter? Well, for a couple of different reasons. Just staying with the medical claim, which is the there's a substantial number of people who had undetectable viral loads, had great CD4 counts, completely stable, who were not missing medications before the change, who have missed medications or have had dosing errors since the change. And so their care has gotten demonstrably worse. There's testimony from the HIV specialists that they have had to change regimens for some people who have gone detectable in their viral loads. The risk of the viral load going to happen yet, but it can happen. It's hard to say exactly when, but it can. And the risk of future harm is what is, you know, bothering our plaintiffs and many others in that class. But the essence of your Eighth Amendment claim, counsel, is that the Commonwealth was deliberately indifferent to these medical needs. The record here appears to exhibit the exact opposite of indifference. The prison recognized a problem, both a problem with some prisoners not taking the medication and having no effective way to police that, and also a problem with the amount of resources that were being consumed by this medication because there was no way to recapture and reuse medication that was given the prisoners and not taken. They studied the problem. They came up with a solution, which whether or not it's the best solution is not a solution that indicates to me they were indifferent to anything. They attempted to come to what was a plausible solution to a problem. And the results of the solution, on the whole, not for everybody, maybe not perfect, maybe not peer-reviewed, but the results of the change seem to have been generally favorable. Not only the favorable change in viral loads, but the favorable change in the economics, which was one of the, and the, which freed up more resources for the patients. So I struggle with the notion of how this can be deliberate indifference. Right, Your Honor. Well, we do, we take issue, obviously, with the, with the savings and the amount of the savings and identifying who's responsible for the waste and where that money can be recaptured. And the people, again, the actual providers in the prisons giving the care, had tracked those return medications and said But under the deliberate indifference standard, the test isn't whether the, isn't whether in some academic sense, the commonwealth is right or wrong. The test is whether the decision to handle the problem in a particular way is reasonable and doesn't work in unconstitutional or undue deprivation of medical, of needed medical treatment for patients. Patients are They are, Your Honor, but like I said, there are, for a, for a number of these, the plaintiffs and for a number of these HIV patients, it went from better to worse, and you can, you can identify who those people are. But let's stick with that. Even that's puzzling me. Because if it was 83 percent before, and that meant there was 17 percent who had undesirable viral loads. If it then went to 95 percent, then there's only 5 percent left. So mathematically, very few people in the 83 could have moved over to the 5, a maximum of 5, if everybody else in the 17 got moved on top of the 83 minus the 5. So, so I'm having trouble seeing that. And in any event, is, what standing do your clients have to complain about whether there was someone else? Yeah, they're, you know, and they are doing fine now. We acknowledge that they have undetectable viral loads and they're doing their best to get to Medline. It's the, I think what we stand on when they claim is the risk of future harm to them from these hiccups. One of them did go detectable right after the change. Peter Poe, he came back to undetectable. I do want to turn my attention to the ADA claim because I think it is different substantially because it's not as fact intensive in that way as regards to treatment. It's that, you know, typically the keep on person program is a program, you know, it's one that doesn't have to exist in the prison system, but in this prison system it does. It was afforded to these patients, you know, and this does somewhat intersect with the medical claim in the sense that the medical providers on the ground, they, you know, they check the medical records, they check the medication logs, they meet with the clients, they take a pill count, they pull the people off of KOP if they need to be pulled off of KOP. Now nobody can have KOP, and that includes a whole lot of people who... Wait, wait, wait, counsel. You're saying that under this record there's a complete exclusion from those, from the KOP? I thought in reading the briefs it was only as to the medication for the HIV. That's right, Your Honor. So it's just as to the HIV patients. But they're not excluded from completely going to the KOP. They, for other medications, still are allowed to participate in that, aren't they? For anything else that's eligible, for antibiotics... Completely. They still participate to some, but in regards to the HIV medication, that's what they were... And it's the HIV medication, which is the one that's used on a daily basis. It's a program, like I said, that was qualified for and it was earned and held by all five plaintiffs and many, many others. And the defendants keep coming back to whether an accommodation is necessary to get the deadline, and that's not really the claim. The claim is that this is a category of people who are being discriminated against just as if they had been denied a kitchen job, you know, if kitchen jobs were allowed. And there's a program there, and patients with one type of disability can avail themselves of the treatment they need in that program, but patients with your client's disability cannot avail themselves of the benefits of that program. That's right. Do we have... It wasn't clear to me in the record what percentage of the administrations of drugs occur through KOP and DOT, because it's not just HIV that is limited to DOTs, I understand it. Right. There's a list of drugs. It's in the Keep On Person Policy. And we've got a list of drugs, but what's that translate into, into real terms? If we take each pill being administered to each person, how many through DOT, how many through KOP? There's no chart to that effect. You know, in the record, there was testimony from the case managers for HIV about their patient population who said the vast majority of their who were not KOP, either for reasons they were suspended or for reasons they elected not to be part of the program. But is there also testimony about a substantial number of drugs other than the drugs for the HIV virus are on the DOT list? Yes, there are other drugs on that list, but there are very few that have ever been KOP for over ten... in fact, none in the record have been KOP for over ten years, and then summarily, you know, as a category, as a class, taken away. We've asked you a number of questions. If you have another point or two to make, go ahead and make it. Only staying with the ADA claim that it's the... it's this program, Keep On Person program, it's hard to articulate the importance to the patients, but it is and was important. And there's testimony from the providers. It was important to the providers. That was a very... it was a known, you know, a very purposeful decision to make them part of the KOP program when HIV medications came out. So we're not doing it in a context where these medications are out in a vacuum. They came online in the 90s. They've always been KOP, and then as a group, they were removed, and that's what we find to be discriminatory. Good morning. There was no error by the district court. This case centers on merely a change in the way medications were dispensed. It doesn't result in any substantive change in the medical care that are provided, and as the record shows, you can see that not only was this decision made after much effort involving a number of professionals over a period of time, but it did result in reduced cost, potentially adherence, and reduced waste. And that was the reasons they went forward. As to the substantive care, you'll see that every inmate that's HIV positive is assigned to an infectious disease doctor that they see either monthly or every two or three months. They're assigned to a case manager, usually a nurse that coordinates their care. They have access to the physician and nurse services that are provided to all inmates. Their viral loads and blood tests are followed and monitored closely. And all that's at issue here, despite the voluminous record that you have, is that they decided for good reason to believe that adherence would be improved, cost would be reduced, if they dispensed it by DOT. And that's really what's before, and the costs here are not million dollars a year, $400,000 a month, representing 47% of the pharmacy services budget for 2% of the inmate population. I would suggest that it was their fiduciary duty to look into areas where they might be able to reduce cost, and it has turned out to be beneficial with no adverse effect to these inmates. Do you have a, we talked about the statistics earlier with Mr. Thompson. What his argument is that I really shouldn't, we shouldn't place much weight on the 95%, because his expert said it really doesn't show that the change from KOP to DOT caused anything. It simply is an artifact of other confounding variables at operation here, such as change in medication, change in prison population. How do you respond to that argument? I'm sort of a simple guy. I look at it as the marker to determine how well patients are doing as a general nature, is this viral load data. And before the change we have 83%, and after we have 95%. Can there be something to say, well maybe it has to do with newer medications? Certainly that probably is the case. But the fact remains, and what they claim is data to say, well it really isn't all that, not showing a lack of adherence for these long-term inmates. But they haven't shown how it's resulted in any adverse effect. Well let's pause on that, because it's not clear they do. I mean, if they showed no change either way, then how would you justify under the ADA denying access to the program to HIV patients, to the KOP program? Well I think, first the ADA is aimed at prohibiting discrimination based on disability statute. By reason of disability, you can't exclude someone from a service or public program. Sure, sure. If they had walks in the yard, an extra hour in the sunlight as a new program as part of their physical enhancement program, and they said HIV patients can't do it, there would be discrimination against the ADA, against HIV patients that need to be justified, wouldn't there? So there's not a penalogical interest that's being served. And here they said if you have this particular disease, you can't participate in the KOP program. So why isn't that discrimination that needs to have some justification? Well they're not precluded from participating. Well they are. They can't get, they are precluded from getting medications for their disease under the program. Well they are able, first they are able to get medications that are covered by KOP. Some of the plaintiffs, for instance, blood pressure, aspirin that are KOP, they're not excluded from that means of dispensing. Yes, the target here was HIV medications. And the reason for the change wasn't to discriminate based on HIV status. It was the belief that if they were dispensed DOT, it would result in reduction of costs. And there was a potential, a good faith belief that it would increase adherence. And I think that is a legitimate basis and it's supported by the record that that in fact has turned out to be the case. So this is not a case, there's over 67 medications that we've listed that are identified that are not part of the KOP program. So I don't believe the ADA, the Rehab Act is the construct for this case. Counsel, while we're on the ADA, because you both have gone straight to the merits in regard to this, but I believe there's an argument that you make that they've waived the ADA claim. Is that right? Waiver. I don't sure if I... I think that may go to the reasonable accommodation claim, Counsel. I think he's right. One of the plaintiffs, Nunez, really out of the five plaintiffs, only one, Nunez, is claiming that he wasn't given or should have a trial over disagreement over accommodation. And the waiver there, thank you Judge, was Nunez has taken the position, and he's testified that the only accommodation he wants is to be able to attend, to have his medications KOP. So in that sense it's a waiver. As to the deliberate indifference, not only was it I think a thoughtful decision, but there is no evidence of adverse effect. And they spent some time in their brief and mentioned just a few minutes ago some of the aspects of why they think there's deliberate indifference. And I think there's a huge gap between the broad strokes that they make, and then when you bear down to the record, it's just not supported. For instance, they claim that their inmates are suffering side effects and have had medication regimen changes because of the change. First, they don't proffer any expert testimony to say these particular patients are unnecessarily suffering side effects or having medication changes because of the change. They don't proffer that. The closest they come to is Dr. Brandsberg, public health doctor, who says, look, in some of the treatments for HIV, efavirans and atripla are medications that can be used, and that they have a tendency sometimes to cause flu-like symptoms or dizziness. And he says that that's why it's generally they're allowed to take it before the bed so they don't have to experience those kinds of side effects. If you look at the record, if you look at the record and you bear down to the record, the only two plaintiffs that have any mention of any side effects are Plaintiff Koh and Doe. And if you look at those particular testimony, it just doesn't support any kind of possible suffering from side effects due to the change. Koh complained of, at one point, feeling pins and needles in his hands and some eyesight trouble. At another point, some skin redness. No claim of any flu-like symptoms or dizziness. The only reference he made to testimony to dizziness, he related to his high blood pressure medication. He actually thought the side effects were due because of the fact that he had his nighttime snack discontinued, which he himself testified he never bothered to follow up on. As far as any change in medication, he did undergo a change in medication, but it had nothing to do with not being able to take it at bedtime. He testified it was to provide him a newer medication to boost his T-cells and lessen the side effects. In January, he had a medication change, but that was due to a skin rash. And the point of giving you that example is when you bore down to the record, it isn't that the record support doesn't support the broad-based claims of unnecessary side effects where they're somehow suffering harm because of the change. I asked Mr. Thompson if there was anything in the record that would shed light on the percentage of drug administrations that occur through KOP as opposed to DOT. Is there anything? I was thinking about that. I can't think of something specific on that. I believe there was testimony that psychotropic-related medications are a huge part of medication distribution, and they are all excluded from the KOP. I just can't give you the percentage. Whose testimony was that? It might have been Dr. Hamill. I'm not sure, Your Honor. I don't believe there's any specific testimony breaking it up that precisely. There was reference to the infectious disease doctors not wanting the change in support of their deliberate indifference claim. Again, if you look at the record, it just doesn't support any type of finding of deliberate indifference. The two doctors certainly were taken, depositions were taken. They testified yeah, they thought that there shouldn't be any change, but they clearly, when you review their testimony, were advocating for the patients who were complaining to them that they didn't want this change, that they liked things the way they were. They did not in any way opine that any of these inmates are suffering adversely because of the change because it's just not there. Should it be for the fact finder to balance those doctors' testimony? I think certainly where factual, not speculation, but base facts rise to a certain level where reasonable minds can differ as to whether or not there's deliberate indifference claims, certainly. Don't forget in this case that the relief that they're seeking is, the only point of relief. They want the wholesale elimination of this dispensing, means of dispensing. And so I would suggest that the evidence would have to rise to a reasonable dispute over whether there's a system-wide issue here as to deliberate indifference, and the record falls far short of that. Unless the panel has any further questions, I would leave the remainder to the brief. Just to address a couple of points raised, Your Honors, in terms of the other drugs that are not part of the KOP program, there is, I think, testimony in multiple places, not to mention the list itself, that these are psychotropics, controlled substances, things with abuse potential, either abuse for recreational abuse or abuse, the potential of self-harm, and that includes things like injectable medicines, things that require syringes. That's the class, that's the list of meds that are not allowed to be KOP, and that is, you know, that again goes to our claim, particular ADA claim, HIV meds are an outlier in that sense. There's no evidence in the record that there's any abuse potential or any evidence that there was any effort at that. This is not about that. That's not my concern. No, but if you put a psychotropic drug on DOT and you don't have a problem with that, that's essentially because there's a good reason to dispense of DOT. Well, here the good reason to dispense HIV drugs DOT is because it's going to improve health and conserve prison resources to a substantial extent. And so if one good reason is okay to put a drug on DOT, why isn't another good reason also enough? But first of all, those reasons are disputed in the facts, and second of all, and You can dispute them on a conclusory level, but there aren't any facts that show, I mean, the evidence of savings is there. You may disagree with it, but I haven't seen any evidence that contradicts it, all right? The evidence of viral loads is there. There's no evidence that contradicts it. Yes, your expert says, well, other things may explain it, but that's not contradictory evidence. Well, first of all, for purposes of the ADA claim, for them to discriminate against this class of patients, they now have the burden to prove that it's necessary for those reasons. And second of all, with respect to costs, the only people who ever studied return of medications were the case managers, and they found that there are pretrial prisoners and transfers from prison to prison. That's responsible for any of the ways to the cost problems. Those are not patient problems. They can be solved and should be solved by DOC's own policy outside of this policy change. And second, same with adherence, that the HIV specialists and the case managers on the ground, not to mention the plaintiffs, all testify to the fact they were adherent. There were no problems that needed solving. There are disputes of material fact there. And like I said, if you're going to discriminate against the class as a whole instead of simply singling out the people who need to have KOP revoked, you need better reasons than have been come up with here and the reasons that haven't come up with here have been disputed. Thank you.